IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:15-CV-72

| | |
|---|---|
| GREER LABORATORIES, INC., INDIVIDUALLY AND AS SUCCESSOR TO ANTIGEN LABORATORIES, INC., <br><br> **Plaintiff,** <br><br> v. <br><br> LINCOLN DIAGNOSTICS, INC., <br><br> **Defendant.** | **ORDER** |

**BEFORE THE COURT** are three motions filed in the alternative by Defendant Lincoln Diagnostics, Inc. ("Lincoln"). (Doc. 13-14). The first is a motion to dismiss under 12(b)(3) with leave to file compulsory counterclaim in pending Central District of Illinois case. The second is a motion to transfer venue pursuant to 28 U.S.C. § 1404(a). The last is a motion to dismiss under 12(b)(6). Plaintiff Greer Laboratories, Inc. ("Greer"), individually and as successor to Antigen Laboratories, Inc. ("Antigen"), has filed a response, (Doc. 19), to which Lincoln has replied, (Doc. 20). Lincoln has also filed a notice of subsequently decided authority. (Doc. 21).

Greer filed its complaint in this case on June 12, 2015. (Doc. 1). Prior to the institution of the instant case, Lincoln filed a complaint in the Central District of Illinois on May 1, 2015. *See Lincoln Diagnostics, Inc. v. Greer Laboratories*, 3:15-cv-3133-CSB-EIL (C.D. Ill. 2015), (ECF 1).[1] On July 6, 2015, Lincoln filed an amended complaint in the Illinois action. (ECF 14). On July 31, 2015, Lincoln filed its motion to dismiss and/or transfer that the Court is now considering. (Doc. 13). On August 31, 2015, Greer filed a motion to dismiss for lack of subject matter

---

[1] The Court will use the (Doc.) format of citation when referencing the filings in this case. The Court will use the (ECF) format of citation when citing to the Illinois action.

1

jurisdiction, alleging that Lincoln failed to meet the $75,000 jurisdictional minimum in the Illinois action. (ECF 19). On September 21, 2015, the court in the Illinois action entered a text only order denying Greer's motion to dismiss stating that the amount in controversy exceeds $75,000.

## I. STANDARD OF REVIEW

A party may move to dismiss for "improper venue." Fed. R. Civ. P. 12(b)(3). "On a motion to dismiss under Rule 12(b)(3), the court is permitted to consider evidence outside the pleadings. A plaintiff is obliged, however, to make only a prima facie showing of proper venue in order to survive a motion to dismiss." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365-66 (4th Cir. 2012) (citing *Mitrano v. Hawes*, 377 F.3d 402, 305 (4th Cir. 2004)). In determining whether a plaintiff has made such a showing, the facts are viewed "in the light most favorable to the plaintiff." *Id.* **Whether venue is improper "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws."** *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 577 (2013). "Thus, 'a case filed in a district that falls within § 1391 may not be dismissed under . . . Rule 12(b)(3).'" *Devil's Advocate, LLC v. Grynberg Petroleum Co.*, 588 F. App'x 264 (4th Cir. 2014) (quoting *Atl. Marine Const. Co.*, 134 S. Ct. at 580).

As a preliminary matter, the Court rejects the very foundation of Lincoln's motion to dismiss under 12(b)(3), namely that it should consider Rule 13. As the Supreme Court made clear in *Atlantic Marine*, a motion to dismiss under 12(b)(3) is directed to federal venue laws. Rule 13(a) is located in the Federal Rules of Civil Procedure. Federal venue laws say nothing about Federal Rule of Civil Procedure 13(a). *See id.* ("Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection

clause."). Lincoln has failed to make a single argument regarding 28 U.S.C. § 1391. Accordingly, it has failed to make a proper objection to whether venue is proper in the instant case and has waived any argument regarding whether venue is proper. Accordingly, the Court will move to Lincoln's first alternative argument.

Lincoln's motion to transfer is founded upon 28 U.S.C. § 1404(a). Section 1404(a) states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." In contrast to § 1406, which applies when the putative transferor court is a court without proper venue, § 1404 allows dismissal or transfer when venue is proper. *See* 28 U.S.C. 1406(a); *History and Purpose of 28 U.S.C.A. § 1404(a)*, Wright & Miller et al., 15 Fed. Prac. & Proc. Juris. § 3841 (4th ed. 2015). "[T]he purpose of . . . section [1404] is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Continental Grain Co v. The FBL-585*, 364 U.S. 19, 21 (1960)).

"In the typical case . . . a district court considering a § 1404(a) motion . . . must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Const. Co*, 134 S. Ct. at 581. Factors relating to the convenience of the parties include

> 1. relative ease of access to sources of proof;
> 2. availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;
> 3. possibility of view of premises, if view would be appropriate to the action; and
> 4. all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Id.* at 581 n. 6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). Public-interest considerations include

> 1. the administrative difficulties flowing from court congestion;
> 2. the local interest in having localized controversies decided at home; and
> 3. the interest in having the trial of a diversity case in a forum that is at home with the law.

*Id.* (quoting *Piper Aircraft*, 454 U.S. at 241 n.6). "The Court must also give some weight to the plaintiffs' choice of forum." *Id.* The Court will now holistically examine the quantity and quality of the above factors after it recounts the factual allegations in the two suits. *See also Husqvarna AB v. Toro Co.*, No. 3:14-CV-103-RJC-DCK, 2015 WL 3908403, at *4 (W.D.N.C. June 25, 2015) (listing eleven factors).

## II. STATEMENT OF FACTS

The Court will consider the allegations of the respective complaints to inform its analysis of the motion to transfer.

The initial complaint in the Illinois action alleges that Greer violated the Illinois Consumer Fraud and Deceptive Business Practices Act as well as the Illinois Deceptive Trade Practices Act and that Greer committed the tort of intentional interference with business relationships under Illinois common law. (ECF 1). The relevant allegations are as follows

> (1) Lincoln manufactures various allergy skin testing devices, including a product known as the Multi-Test II (*id.* at ¶ 7);
> (2) ALK-Abello ("ALK"), a Texas company, is the primary distributor for Lincoln and distributes the Multi-Test II (*id.* at ¶ 10);
> (3) ALK supplied the Multi-Test II to Antigen (*id.* at ¶ 10);
> (4) On April 15, 2013, Ares Life Sciences, a healthcare-focused investment group, acquired Antigen (*id.* at ¶ 11);
> (5) On April 30, 2013, Ares acquired Greer (*id.* at ¶ 12);
> (6) Greer also manufactures and markets allergy products, including allergy skin test products (*id.* at ¶ 8);
> (7) Greer was allowed to sell the Multi-Test II to Antigen customers for a period of time but eventually ceased selling the Multi-Test II (*id.* at ¶¶ 13-14)
> (8) Greer now manufactures, markets, and distributes the Skintestor OMNI ("OMNI"), a product that is similar to the Multi-Test II (*id.* at ¶ 15); and
> (9) Lincoln continued to manufacture the Multi-Test II; however, after Greer ceased selling the Multi-Test II it told customers who previously purchased the Multi-Test II that it was no longer being manufactured and/or the OMNI was the replacement for the Multi-Test II (*id.* at ¶¶ 17-19).

The amended complaint in the Illinois action asserts the same three causes of action. (ECF 14). It includes specific allegations of customers who contacted Greer to purchase more Multi-Test II products and how they contacted Greer. (*Id.* at ¶¶ 18 – 28). It also alleges that "[u]pon information and belief, from April 30, 2013 until the present date, other consumers who had previously been purchasers of the Multi-Test II relied on Greer's misrepresentation that the Multi-Test II was no longer being manufactured." (*Id.* at ¶ 29). Lincoln further alleges that "[t]he identities of the customers who inquired as to the status of the Multi-Test II, but purchased the Skintestor OMNI instead, are in Greer's exclusive control." (*Id.* at ¶ 31). Lincoln seeks an injunction prohibiting Greer from telling consumers that the Multi-Test II is no longer available and ordering Greer to refer consumers requesting the Multi-Test II products to Lincoln. (*Id.* at 8, A). Lincoln also seeks damages due to the business lost.

Greer's complaint in this Court alleges generally that the action involves Lincoln's attempt to divert customers from Antigen and Antigen's successor-in-interest Greer. (Doc. 1, at ¶ 1). Greer's Complaint asserts two causes of action: (1) violation of the North Carolina Unfair and Deceptive Trade Practices Act and (2) Tortious Interference with Prospective Business Advantage under North Carolina common law. (*See id.*). The complaint alleges that Lincoln and Greer are competitors in the skin test device market. (*Id.* at ¶ 10). Greer seeks damages resulting from Lincoln's mailing of a letter in September of 2013. These damages include sales lost to Lincoln and loss of future sales under a distributor agreement with ALK, as described below. (*Id.* at ¶ 3).

Specifically, Lincoln manufactures the Multi-Test II which competes with the OMNI, which Greer currently distributes, sells, and markets under an agreement with QTI, Inc. (*Id.* at ¶¶ 9-10). ALK acquired exclusive distribution rights from Lincoln for certain products. (*Id.* at ¶ 12). In the First Letter Agreement, ALK appointed Antigen as a sub-distributor of the Multi-Test II.

(*Id.* at ¶ 13). As has been recounted above, in April of 2013 Ares acquired both Antigen and Greer's parent companies, and as a result, Greer and Antigen became affiliates. (*Id.* at ¶ 14).

In September 2013, Lincoln attempted, unsuccessfully, to acquire Antigen's Multi-Test II customer list from ALK. (*Id.* at ¶ 15). Then, Lincoln purchased a mailing list from the American Academy of Otolaryngic Allergists ("AAOA"). (*Id.* at ¶ 16). AAOA represents over 2,700 Board-certified otolaryngologists and health-providers who, in part, diagnose and treat allergic diseases. (*Id.* at ¶ 17). Greer alleges, upon information and belief, that some of these AAOA members are located in North Carolina. (*Id.* at ¶ 18).

Then, in September 2013, Lincoln's Chairman of the Board of Directors, Gary L. Hein, sent a letter (the "Hein Letter") addressed broadly to "To Whom It May Concern" stating:

> We want you to know that you can now purchase Multi-Test products directly from the manufacturer, Lincoln Diagnostics. We believe that Antigen Laboratories has been absorbed into Greer Laboratories and, therefore, Multi-Test products will not be available from Antigen Laboratories in the future.

(Doc. 1, at ¶ 19). Greer claims that the Hein Letter misrepresented Antigen's corporate status, because it was only affiliated and not absorbed into Greer. (*Id.* at ¶ 20). Further, Greer claims that the Hein Letter misrepresented Antigen's ability to provide the Multi-Test II product, even though it could do so pursuant to its agreement with ALK. (*Id.*). Greer claims that this letter was sent to lure away Antigen's customers. (*Id.*).

Greer claims that the Hein Letter caused Antigen to lose customers. (*Id.* at ¶¶ 23-24). On March 18, 2014, the Letter Agreement between ALK and Antigen was amended (the "Amended Letter Agreement."). (*Id.* at ¶ 26). The Amended Letter Agreement required Antigen to forecast the amount of Multi-Test products it intended to order and required Antigen to purchase a certain percentage of the aggregate quantity of the amount it ordered during the prior year. (*Id.* at ¶ 27). On the same day the Amended Letter Agreement was signed, Greer, Antigen,

and ALK agreed that Antigen could assign said Agreement to Greer. (*Id.* at ¶ 28). Around a year later, March 23, 2015, ALK informed Greer that it was terminating the Amended Letter Agreement because Greer defaulted according to the terms of said Agreement, including by failing to purchase the minimum amount of Multi-Test products. (*Id.* at ¶¶ 31-32). Greer maintains that its failure to meet the quota was caused in part by Lincoln's conduct. (*Id.* at ¶ 32).

## III. ANALYSIS

### A. Convenience of the Parties and Witnesses

Of import, Greer chose this venue. However, the Court would be remiss to ignore the fact that Greer only filed this complaint in this district after having been served with a complaint in the Central District of Illinois. The Court also notes that Greer admits that it "maintains a place of business at 4544 Middaugh Avenue, Downers Grove, IL 60515." (ECF 17, at ¶ 4). Both parties are subject to personal jurisdiction in each state. Greer is a North Carolina company and Lincoln is located in Illinois.

Regarding access to sources of proof, much of the proof will be in the possession of the respective parties. Presumably Lincoln will have possession of the persons to whom it mailed the Hein Letter. Further, Greer would likewise have possession of records detailing the customers it spoke to regarding the Multi-Test II. Both parties would likely use some form of their own (and perhaps each other's) corporate records in an attempt to prove loss of business. Both parties may also seek information from third parties. The only information in the record regarding third parties as of now is persons or entities from New York, Texas, Arizona, Indiana, Georgia, Colorado, Oregon, and Florida. (*See* ECF 14, at 11). ALK is a Texas entity. Lincoln has not forecasted the extent to which potential witnesses would be inconvenienced. *See Capital One Fin. Corp. v. Drive Fin. Servs., L.P.*, 434 F. Supp. 2d 367, 376 (E.D. Va. 2006) ("The party

7

asserting witness inconvenience has the burden to proffer, by affidavit or otherwise, sufficient details respecting the witnesses and their potential testimony to enable the court to assess the materiality of evidence and the degree of inconvenience."). Overall, access to sources of proof is a neutral factor.

Moreover, there are no issues forecasted regarding enforceability of a judgment obtained. Further, a view of a premises is not necessary.

The Court will now consider "all other practical problems that make trial of a case easy, expeditious and inexpensive." Having these cases proceed in different fora would not benefit either party. Of course, each party would like to litigate the case in the location where they filed. However, no party can seriously contend that litigating the instant cases in different locations would result in a decrease in overall cost or an increase in speed. Further, the Court notes that counsel for both parties would have to communicate with counsel in the opposite case to ensure that trial strategies in one case do not negatively impact the resolution of the case they are litigating. This is a factor weighing in favor of transfer.

On the whole, the Court finds that the convenience of the witnesses and parties weighs slightly against transfer.

      B.      Interests of Justice

The Court finds that the interests of justice weighs heavily in favor of transfer.

The Court notes that the period from filing to disposition and filing to trial are somewhat faster in this district than in the Central District of Illinois.[2] Further, Greer's action raises issues of North Carolina law, with which this Court is familiar.

---

[2] For the twelve-month period ending on June 30, 2015, the Western District of North Carolina had an 8.5 month median time from filing to disposition; whereas the Central District of Illinois had a 10.8 month median time from filing to disposition. United States Courts, *Federal Court Management Statistics, Table U.S. District Courts –*

8

Greer made the argument that if the Illinois action were dismissed for lack of subject matter jurisdiction, then the parties would still litigate on two fronts if the action were transferred. Lincoln noticed the Central District of Illinois' text-only denial; however, the Court would still have checked to see if the motion had been ruled upon. This is just a small example of the difficulty that results when two cases involving the same parties with similar issues are litigated in different districts. *See Kyle v. McDougall*, No. 5:14-CV-201-FL, 2014 WL 4728816, at *6 (E.D.N.C. Sept. 23, 2014) ("[C]ourts in this Circuit have recognized that "[w]hen related actions are pending in the transferee forum, the interest of justice is generally thought to weigh heavily in favor of transfer."); *Quantum Catalytics, LLC v. VantagePoint Venture Partners*, No. CIV A H-07-2619, 2008 WL 5272483, at *3 (S.D. Tex. Dec. 16, 2008) ("Pursuant to no logical analysis can it be said that utilizing the resources of two courts to resolve the same issues involving the same parties is efficient."); *see also Victaulic Co. v. E. Indus. Supplies, Inc.*, No. CIV.A. 6:13-01939, 2013 WL 6388761, at *3 (D.S.C. Dec. 6, 2013) (applying first-to-file rule).[3]

---

*Combined Civil and Criminal* (June 30, 2015), *available at* http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2015/06/30-3.

[3] No party has at length discussed the "first to file" rule. "The Fourth Circuit adheres to the 'first-filed rule,' which holds that when similar lawsuits are filed in multiple fora, 'the first suit should have priority absent the showing of balance of convenience in favor of the second action.'" *Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*, No. 7:11-CV-187-FL, 2012 WL 1825331, at *4 (E.D.N.C. May 18, 2012) (quoting *Volvo Cons. Equip. N. Am., Inc. v. CLM Equip. Co. Inc.*, 386 F.3d 581, 594-95 (4th Cir. 2004)). The Court holds that it does apply. Further, the Court finds that the exceptions to the rule, namely the balance of convenience consideration, do not warrant keeping the action in North Carolina. The Court also notes that merely because suits are sufficiently similar for the "first-to-file" rule to apply does not mean that the claims presented in the second action would constitute compulsory counterclaims in the first action. *See US Airways, Inc. v. US Airline Pilots Ass'n*, No. 3:11-CV-371-RJC-DCK, 2011 WL 3627698, at *2 (W.D.N.C. Aug. 17, 2011) ("However, this Court's finding of substantial similarity under the third factor of the first-filed rule does not necessarily require a finding that U.S. Airways's claims are compulsory counterclaims in the N.Y. Action, which is analyzed under a different standard.").

While this Court is not ruling on the issues regarding Rule 13 of the Federal Rules of Civil Procedure, the Court notes that the central issue in both cases is whether or not Greer or Lincoln competed in an unfair manner by taking or undermining the other's prospective or current client base. While Greer attempts to stress the differences in the two cases, the Court finds that they are similar enough to merit a conclusion that trying them in two different district would be an enormous waste of resources. *Realson v. Univ. Med. Pharm. Corp.*, No. 409-CV-3277-TLW-TER, 2010 WL 1838911, at *5 (D.S.C. May 6, 2010) ("Trying a controversy piecemeal or trying particular issues without settling the entire controversy makes no sense as a matter of judicial economy."). The Court refuses to indulge in the belief that testimony and argument about Lincoln's alleged indiscretions will not be introduced in the Illinois action, especially considering the fact that Greer has raised the affirmative defense of unclean hands. Likewise, the Court would find it difficult to curtail the introduction of what would be duplicative evidence regarding causation of the loss of the Amended Letter Agreement when Lincoln alleges in the Illinois action that Greer purposefully told customers that Lincoln's product had been discontinued.

Accordingly, the Court holds that the interests of justice strongly weighs in favor of transfer.

On the whole, Greer's selection of North Carolina as its forum is outweighed by the considerable waste of both the parties' and the judicial system's resources that would result from litigating these issues in different districts.

**IT IS, THEREFORE, ORDERED THAT** the instant case shall be transferred to the Central District of Illinois. The Court does not rule on whether Rule 13 precludes the

commencement of this action and does not pass on whether Greer's claim are subject to dismissal under Rule 12(b)(6).

Signed: December 15, 2015

Richard L. Voorhees
United States District Judge